# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 19-31011

United States Court of Appeals
Fifth Circuit

**FILED**

May 22, 2020

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

versus

SUSAN KIRCHOFF JAMES,
also known as Susan James, also known as Susan Kirchoff,

Defendant-Appellant.

Appeal from the United States District Court
for the Eastern District of Louisiana

Before SMITH, HO, and OLDHAM, Circuit Judges.
JERRY E. SMITH, Circuit Judge:

Susan James was found incompetent to stand trial because of mental illness. The district court granted the government authorization to administer antipsychotic medication to James involuntarily for the sole purpose of restoring her competency for trial. She brings a second interlocutory appeal per *Sell v. United States*, 539 U.S. 166 (2003). We affirm.

No. 19-31011

I.

James has been in the government's custody for two-and-one-half years after her arrest and indictment for allegedly sending death threats by email to her aunt and uncle, in violation of 18 U.S.C. § 875(c). In the interim, the district court found her incompetent to stand trial and ordered that she be committed for restoration of competence.

While incarcerated, James has been psychiatrically evaluated by several medical professionals. To determine competency, James was evaluated by a Bureau of Prisons ("BOP") psychologist, who concluded that James was competent notwithstanding her considerable mental health issues. James was also evaluated by her expert psychiatrist, Dr. Loretta Sonnier, who disagreed with the initial BOP conclusion and determined that James's delusional persecutory beliefs rendered her incompetent. The BOP, after discovering that James had fabricated text messages on which its psychologist partly based her report, stipulated to the findings of James's expert regarding James's incompetence.

James underwent further BOP psychological evaluation specifically for purposes of restoring her competency. A predoctoral intern, under the supervision of BOP psychologist Hayley Blackwood, interviewed James regularly over five months. Blackwood subsequently submitted a report suggesting that non-pharmacological treatment is unlikely to restore James's competency. Around the same time, BOP psychiatrist Gary Etter interviewed James, reviewed her medical history, and prepared a treatment plan proposing antipsychotic medication. Because James refuses to take medication willingly, Etter proposed injections of the antipsychotic drug Risperdal Consta. Dr. Judith Cherry, the chief psychiatrist at James's holding facility, endorsed Etter's plan at a BOP administrative hearing, and BOP psychiatrist Jose Silvas agreed with the plan after independently evaluating James.

2

No. 19-31011

Blackwood, Silvas, and James testified at the *Sell* hearing. The district court granted the government authorization to administer the involuntary treatment but stayed its order pending James's first appeal.

In *United States v. James*, 938 F.3d 719, 720–21 (5th Cir. 2019), this court held—as a matter of first impression—that the government's burden in cases such as this is proof by clear and convincing evidence. "Because [the panel could not] determine what standard the district court applied, [it] vacate[d] the *Sell* order and remand[ed] to allow the district court to apply the clear and convincing standard in the first instance." *Id*. at 723. On remand, the district court clarified that it had applied the correct standard, and it granted the government's request a second time, detailing its analysis in a seventeen-page opinion. James again appeals.

## II.

"In reviewing a district court's order to medicate a defendant involuntarily, we review findings of fact for clear error and conclusions of law *de novo*." *United States v. Gutierrez*, 704 F.3d 442, 448 (5th Cir. 2013). "A factual finding is not clearly erroneous as long as it is plausible in light of the record read as a whole." *United States v. Dinh*, 920 F.3d 307, 310 (5th Cir. 2019).

Before the government may administer antipsychotic drugs involuntarily for the sole purpose of restoring competency to stand trial, it must prove four elements: (1) "that important governmental interests are at stake," taking into account that "[s]pecial circumstances may lessen the importance of that interest"; (2) "that involuntary medication will significantly further those . . . interests"; (3) "that involuntary medication is necessary to further those interests"; and (4) "that administration of the drugs is medically appropriate." *Sell*, 539 U.S. at 180–81 (emphases omitted). Each element must be proven by clear and convincing evidence. *James*, 938 F.3d at 723.

3

No. 19-31011

James challenges the district court's order on all four *Sell* factors. We review the first factor *de novo* and the other three for clear error. *United States v. Palmer*, 507 F.3d 300, 303 (5th Cir. 2007).

A.

"The Government's interest in bringing to trial an individual accused of a serious crime is important." *Sell*, 539 U.S. at 180. That said, "[s]pecial circumstances may lessen the importance of that interest." *Id.* If, for example, a defendant would otherwise face "lengthy confinement in an institution for the mentally ill[,] that would diminish the risks that ordinarily attach to freeing without punishment one who has committed a serious crime." *Id.* Similarly, it might be consequential "that the defendant has already been confined for a significant amount of time (for which he would receive credit toward any sentence ultimately imposed . . . )." *Id.* But even under such circumstances, a court may determine that the government's interest remains sufficiently important. *See id.* (stating that "potential for future [civil] confinement" or ultimate credit for time served "affects, but does not totally undermine, the strength of the need for prosecution"). It is therefore enough that a court "consider the facts of the individual case in evaluating the Government's interest in prosecution." *Id.*

James's charges carry a maximum imprisonment of five years; accordingly, she concedes that she is accused of a "serious" crime under this circuit's precedent. *See Palmer*, 507 F.3d at 304. She asserts, however, that hers are "special circumstances" reducing the importance of the government's interest. Specifically, James suggests that she could be civilly committed given "that a dangerousness determination already was made,"[1] and she notes that she

---

[1] James also states, erroneously, that "the federal . . . statute requires that an

4

No. 19-31011

already has been confined for half of the maximum. She contends that such circumstances, combined with the relative mildness of her actions compared to those in other § 875(c) prosecutions, critically diminish the government's interest in prosecution.

Those theories are unpersuasive. First, it is not enough that James could *potentially* be civilly committed; for the government's prosecutorial interest to be lessened meaningfully, James's civil commitment would need to be *certain*.[2]

James's civil commitment is not a certainty. She would face civil commitment only "[i]f, after [a] hearing, the court [should] find[] by clear and convincing evidence that [she] is presently suffering from a mental disease or defect as a result of which [her] release would create a substantial risk of bodily injury to another person or serious damage to the property of another." 18 U.S.C. § 4246(d). Although the magistrate judge had found that James could not be released while "reasonably assur[ing] the safety of any other person and the community," he did not purport to base his decision exclusively (or at all) on James's "mental disease or defect." In fact, the chief psychiatrist at the facility where James was being held noted that James "is not imminently dangerous," at least "in [the] secure correctional environment." And "[o]ther than making threats over [email], the record contains no evidence of any past violence on [her] part." *Gutierrez*, 704 F.3d at 450. To be sure, James could *potentially* be civilly committed, but such potentiality "is far from certain[ty]." *Id.*

---

individual's release be imminent before civil commitment is considered." In fact, the statute explicitly allows hearings for persons "committed to the custody of the Attorney General pursuant to section 4241(d)." 18 U.S.C. § 4246(a). Such persons include defendants, like James, whom a court has found to be "presently suffering from a mental disease or defect rendering [them] mentally incompetent" to stand trial. *Id.* § 4241(d).

[2] *Gutierrez*, 704 F.3d at 450 ("[T]he government's interest in prosecution is not diminished if the likelihood of civil commitment is uncertain.").

No. 19-31011

Second, "even assuming [James] would serve little or no prison time if tried and convicted, the government's interest in prosecution is not extinguished." *Id.* at 451.  James is accused of threatening her family members' lives.  The government bears an interest not in punishing her *per se* but in trying her and vindicating the law publicly.  *See id.* (citing *Palmer*, 507 F.3d at 304).  "Additionally, conviction would authorize the district court to impose a term of supervised release, which would facilitate monitoring of [James] to ensure that [she] does not pose a threat to others."  *Id.*

The district court, weighing such factors, determined that James's were not "[s]pecial circumstances [ ] lessen[ing] the importance of [the government's] interest."  *Sell*, 539 U.S. at 180.  That determination was not error.

## B.

If the government has an important interest in restoring the defendant to competency, it next must persuade the court "that involuntary medication will *significantly further* those . . . interests."  *Id.* at 181 (emphasis in original). The calculus has two subparts:  The government must show, first, "that administration of the drugs is substantially likely to render the defendant competent to stand trial" and, second, "that administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense."  *Id.*  James asserts that the government failed to meet its burden on both counts.

## 1.

James contends that the government failed to show that the proposed medication is "substantially likely" to restore her competence.  Specifically, she asserts that there was an insufficient basis in the record:  No one provided an exposition of the mechanism of the treatment or a statistical probability of the

treatment's success, and, at the *Sell* hearing, the prosecution effectively spoon-fed the term "substantially likely" to its witness, Silvas. Such evidence, James asserts, was insufficient to satisfy the government's burden, and the district court clearly erred by holding otherwise.

We disagree. Several doctors stated on the record that medical treatment should restore James's competence. Etter, in devising James's proposed treatment plan, stated "that treatment with antipsychotic medication is . . . likely to resolve the psychotic symptoms of [James's] Delusional Disorder that prevent her from being able to work productively with her attorney to defend herself in court." Cherry, who conducted the BOP hearing, agreed that Etter's proposed treatment is "recognized as effective and safe treatment for Delusional Disorder." Blackwood testified that, regarding her four-year employment with the BOP, she could "think of at least 10 to 15 individuals who have been successfully restored through treatment with medication," and she could "think of about two people who have not been successfully restored to competency." And Silvas, who agreed with the government's characterization of the treatment's success as "substantially likely," spoke from thirty-seven years' experience during which he had prescribed antipsychotic medication to "hundreds" of patients.

Although none of those doctors explained precisely what he or she meant by "likely" or "substantially likely" (or "effective"), James neither elicited contradictory testimony on cross-examination nor submitted contradictory evidence. In fact, her expert psychiatrist opined that "within a reasonable degree of medical certainty, [ ] it is substantially likely that with proper psychotropic medications, Ms. James's mental disease would improve enough as to permit her to have a rational understanding of the proceedings and assist counsel properly in her defense." To be sure, the government could have submitted

more robust evidence—such as scientific studies, patient success rates, and mathematical probabilities—but the numerous medical opinions *do* constitute evidence. And, whatever the strength of that evidence, the record provides no reason to question its accuracy.

Given James's failure to submit contradictory evidence, we cannot say that the district court's determination was "implausible in light of the record as a whole," *United States v. Griffith*, 522 F.3d 607, 612 (5th Cir. 2008), or that we are left "with the definite and firm conviction that a mistake has been committed," *United States v. Rodriguez*, 630 F.3d 377, 380 (5th Cir. 2011).[3] The district court's finding is not error at all, much less clear error.

2.

James asserts that the government failed to meet its burden of showing that the proposed medication "is substantially unlikely to have side effects that will interfere significantly with [James's] ability to assist counsel in conducting a trial defense." *Sell*, 539 U.S. at 181. She posits that the expert opinions considered not her individual characteristics but generalities based on her diagnosis. In sum, James urges, this court should hold that the district court clearly erred by accepting the government's insufficient and generic evidence.

Again, we disagree. As the district court noted, Silvas recounted the usual, generally mild side effects of antipsychotic medications such as Risperdal Consta. Etter's greatest concern was the medication's sedative effect, though he stated that such effect "can usually be managed effectively" in that it "tends to lessen over time, . . . is dose dependent[,] and usually occurs early in treatment before the patient has acclimated to taking the medication." As

_____

[3] *See also United States v. Silva*, 865 F.3d 238, 243 (5th Cir. 2017) (per curiam) (finding no clear error, in part, because the defendant "presented no evidence to contradict this testimony").

for the more serious (though rare) potential side effects that could significantly hamper James's defense, such as Tardive Dyskinesia (a potentially irreversible movement disorder), both doctors noted that the risk of occurrence is low and that, even then, it could be minimized through close monitoring.

Those opinions were based on more than James's general diagnosis. Before devising James's proposed treatment, Etter "interviewed [James], reviewed her records, . . . [and] discussed the case in detail with Dr. Blackwood," who was familiar with James's delusional beliefs and behavioral history. Etter noted that "[t]here are no known contraindications to any of the proposed medications for [ ] James." He made the general observation that Tardive Dyskinesia "most often occurs in those over the age of 50 . . . and in long-term treatment with relatively high doses of antipsychotic medications." Although Etter did not explicitly apply that statement to James, the district court could read between the lines: James is not yet fifty years of age; she should reach a "full therapeutic response" within "[t]hree to six months of antipsychotic medication treatment"; and her dosage would begin low and would be kept as minimal as possible.

Similarly, Silvas noted that James does not present any of the acknowledged risk factors for side effects from antipsychotics. He testified that the most significant side effects of antipsychotics are not associated with Risperdal Consta, the proposed medication for James's condition. Regardless, Silvas stated, James would "be monitored to see if [side effects] emerge, how they emerge, and to what degree they emerge, and then efforts will be made to manage them, decrease them, and, if possible, eradicate them."

The district court was presented with ample evidence concerning the medication's expected side effects both generally and as to James. "[A]ll the doctors who testified at the hearing agree that . . . in the vast majority of

No. 19-31011

cases"—and in James's case—"the side effects can be treated or minimized." *Palmer*, 507 F.3d at 304.  Accordingly, it was not clearly erroneous for the district court to find such evidence clear and convincing of the conclusion that the medication's side effects are substantially unlikely to interfere significantly with James's defense.

C.

Even if involuntary medication is substantially likely to further an important governmental interest, "the court must conclude that [such] medication is *necessary* to further [that] interest[]." *Sell*, 539 U.S. at 181.  The inquiry, as relevant here, requires the court "find that any alternative, less intrusive treatments are unlikely to achieve substantially the same results." *Id.*

James asserts that the government failed to present sufficient evidence to surmount its burden.  She posits that "BOP officials did not appear to have even considered the possibility of alternative treatment," aside from "group educational classes that, by BOP's own account, would not actually address the causes of [James's] incompetency."  And, although "some BOP officials opined generally that no other type of treatment will ever work with delusional disorder, [n]o expert cited any authority to support those broad claims . . . [or] tied their assessments to patient-specific analysis."  By accepting such evidence as clear and convincing, James urges, the district court clearly erred.

As a preliminary matter, it is largely irrelevant whether BOP considered or offered James meaningful alternative treatment.  The question is not whether BOP has attempted less intrusive treatment; instead, it is whether such treatment would be "unlikely to achieve substantially the same results" as medication. *Sell*, 539 U.S. at 181.  Depending on the evidence before it, the court may be able to discount alternative treatments that have not been tried. Although the government's position would be strengthened if it could cite

10

alternative treatment options that had been tried for James without success, there is no requirement that it first pursue such alternatives.[4]

More importantly, the record supports the district court's determination that less intrusive means are unlikely to achieve results similar to those of involuntary medication. First, James is unwilling to attend group sessions for fear that her attendance would be a tacit admission of mental illness. James suggests that those specific group sessions are not designed for persons with her condition and, therefore, would be ineffective. Perhaps that is so. Regardless, nothing in the record suggests that James's refusal to attend such sessions was informed by a belief that they are inappropriate for her condition; instead, in the words of her own expert psychiatrist, she has "strongly resisted the suggestion that she [has] a mental illness that is in need of treatment." The district court might have reasonably inferred that she would feel the same way—even if the treatments were tailored to her condition.

Second, medical experts are on the record as explaining that James is unlikely to respond to non-pharmacological treatment. James believes that those around her are conspiring against her. Blackwood testified that, on account of James's inability to consider alternative explanations for her case, talk therapy "would not be successful." Etter, when drafting the proposed treatment plan, wrote that "less intrusive forms of treatment, such as psychotherapy have been shown to be ineffective in conditions such as [James's] for the treatment of a psychotic disorder." Sonnier—James's own expert—opined that "[p]sychotropic medications . . . [would be] the least intrusive measure for competency restoration." Once again, James did not submit any evidence to

---

[4] *See United States v. Gomes*, 387 F.3d 157, 162 (2d Cir. 2004) (accepting doctors' testimony "that alternative forms of treatment (such as verbal therapy) would be ineffective," even though that notion was "untested" because the defendant "had no treatment of any kind during his time in custody").

the contrary.

The government presented multiple, uncontradicted expert witnesses who explained, while referencing James's specific condition and manifest symptoms, that she would not respond to alternative treatment. By finding such evidence clear and convincing, the district court did not clearly err.

D.

To satisfy the fourth and final prong of the *Sell* analysis, the government must show "that administration of the drugs is *medically appropriate*, *i.e.*, in [James's] best medical interest in light of [her] medical condition." *Sell*, 539 U.S. at 181. The analysis is solely concerned with the patient: "[I]n analyzing this factor, courts must consider the long-term medical interests of the individual rather than the short-term institutional interests of the justice system." *United States v. Ruiz-Gaxiola*, 623 F.3d 684, 703 (9th Cir. 2010). The requirement "ensur[es] that antipsychotic medications will be administered only in those cases where appropriate by medical standards," *i.e.*, that the medication could "be administered [ ] for treatment purposes" and not only to serve the governmental interest. *Washington v. Harper*, 494 U.S. 210, 222 n.8 (1990).

James challenges the district court's finding that administration of Risperdal Consta is medically appropriate. She claims that the government presented no evidence as to how the medication would be in her long-term medical interests, particularly when considering that her treatment is expected to be short and that, regardless, long-term treatment increases the chances of serious side effects. Even in the short term, James asserts that there is no evidence on record suggesting how the medication would provide her any *medical* benefit—as distinguished from the non-medical benefit of allowing a faster

12

resolution of her case. The district court clearly erred, James contends, because the record lacks evidence "that long-term benefits to Ms. James of being forcibly injected with [Risperdal Consta] would outweigh all of the possible harms."

That argument incorrectly assumes that the government's interest in restoring James to competency is entirely separate from James's medical interest. To the contrary, any treatment program would seek—for James's own sake—to reduce the frequency and severity of her explosive outbursts and to restore her ability to engage in rational communication and decisionmaking. Of course, such goals were presented to the district court as serving the government's interest, but the court may reasonably infer that they would also serve James's.[5] There is, in other words, no requirement that the record contain an explicit statement that a reduction in the patient's mental illness symptoms would be a "medical benefit."

That is not to suggest that just any proposed treatment to restore a defendant's competency will be "medically appropriate" under the fourth *Sell* factor. Certain side effects might not "interfere significantly with the defendant's ability to assist counsel in conducting a trial defense," *Sell*, 539 U.S. at 181, yet nevertheless might present serious health consequences. A high risk of such side effects may render the treatment medically improper and therefore impermissible—even if all other *Sell* factors be met and the medication should therefore bring the patient *some* benefit (either short- or long-term) in the form of improved cognitive understanding and communication.

---

[5] James's irrational behavior obviously has had a deleterious effect on her. In the words of her own psychiatrist, Sonnier, James's "paranoia and persecutory delusions . . . have impaired her level of functioning at work, in interpersonal relations, and led to strained relationships with her family members."

Regardless, the record does not suggest that the administration of Risperdal Consta would be medically improper. Cherry, when certifying the BOP administrative hearing, noted that "[a]ntipsychotic medication is [ ] recognized as a safe and standard treatment for Delusional Disorder," a sentiment shared by James's expert, Sonnier. Silvas testified that James's case does not present any of the recognized risk factors for side effects linked to Risperdal Consta, which itself has fewer serious side effects than do earlier generation antipsychotics. Silvas and Etter noted that serious side effects (such as Tardive Dyskinesia) may nevertheless develop after long-term treatment but that those side effects can be effectively monitored and managed.

Without addressing those points, James contends that the proposed treatment cannot be in her long-term medical interests because "the proposed treatment plan anticipates that [she] will be medicated only to the extent necessary to restore her competency for trial and no longer." That is not quite accurate. More precisely, the plan anticipates that James will be *involuntarily* medicated with Risperdal Consta for as short a time as possible. As Silvas explained, once James's faculties are restored, ideally she will "consent [to] voluntary treatment, [which would] open[ ] up a whole line of treatment options, . . . mak[ing] it [ ] easier for [doctors] to adjust the dose to a lower better tolerated dose."

The government presented the district court with detailed, uncontested evidence suggesting that the proposed treatment plan would be in James's medical interest. It was not clearly erroneous for the district court to find such evidence clear and convincing.

AFFIRMED.