# United States Court of Appeals

## For the Eighth Circuit

_____

No. 12-2274

_____

United States of America,

*Plaintiff - Appellee*,

v.

Shawn Allan Mackey,

*Defendant - Appellant*.

_____

Appeal from United States District Court
for the District of South Dakota - Rapid City

_____

Submitted: December 14, 2012
Filed: June 10, 2013

_____

Before LOKEN, BRIGHT, and COLLOTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

Shawn Mackey was indicted for failing to register as a sex offender, in violation of 18 U.S.C. § 2250(a).  After the parties stipulated that Mackey was incompetent to understand the proceedings against him or to assist in his own defense, *see* 18 U.S.C. § 4241, the government moved to medicate Mackey involuntarily to restore his competency to stand trial.  Applying the criteria set forth in *Sell v. United States*, 539

U.S. 166 (2003), the district court[1] granted the motion.  Mackey appeals, and we affirm.

I.

On June 15, 2010, a grand jury charged Mackey with one count of failing to register as a sex offender, as required under the Sex Offender Registration and Notification Act ("SORNA").  The district court ordered Mackey detained pending trial, and later granted Mackey's motion for a mental evaluation, pursuant to 18 U.S.C. §§ 4241(a) and 4242(a).

Mackey was evaluated at the Federal Detention Center in Seattle, Washington. Mackey refused to participate in the competency assessment process, so mental health professionals were unable to provide an opinion concerning his competency to stand trial.  Accepting a stipulation of the parties, however, the district court later found after a hearing that Mackey was suffering from a mental disease or defect that rendered him mentally incompetent to understand the proceedings against him or to assist in his defense.  *See* 18 U.S.C. § 4241.  In August 2011, the court ordered Mackey committed to the custody of the Attorney General for further evaluation and treatment at a suitable federal medical facility, with the goal of determining whether there is a substantial probability that Mackey would attain the capacity to stand trial in the foreseeable future.  *See id.* § 4241(d)(1).

In March 2012, after receipt of a forensic mental health evaluation prepared at the United States Medical Center for Federal Prisoners in Springfield, Missouri, the government moved the court to conduct a *Sell* hearing to determine whether Mackey should be medicated involuntarily.  The district court heard testimony from two

---

[1]The Honorable Jeffrey L. Viken, United States District Judge for the District of South Dakota.

doctors at the Medical Center—Dr. Christina Pietz, Ph.D., ABPP, Staff Psychologist, and Dr. Robert Sarrazin, M.D., Chief of Psychiatry. Dr. Pietz is a board-certified forensic psychologist. In more than twenty years at the United States Medical Center, Dr. Pietz's primary responsibility has been to complete court-referred competency and sanity evaluations, civil commitments, and risk assessments. She has treated a number of patients who suffer from delusional disorders, and testified over three hundred times in federal court regarding patients' mental health or competency to stand trial. Dr. Sarrazin is board certified in general psychiatry, forensic psychiatry, and psychosomatic medicine. As Chief of Psychiatry at the Medical Center, he treats patients with psychotic disorders such as schizophrenia, delusional disorder, and psychotic disorder not otherwise specified. Approximately one hundred patients at the Medical Center are involuntarily medicated at any given time.

Dr. Pietz testified that she tried to interview Mackey on seven occasions between December 1, 2011, and February 7, 2012, but that Mackey refused to talk to her on almost all of those occasions, so she was unable to have extensive interviews with him. Dr. Pietz was aware from the forensic evaluation in Seattle that Mackey may suffer from a mental illness, and she was aware that the district court had found Mackey incompetent to stand trial. She testified:

> [Mackey] made a number of comments that suggested he was suffering from a mental illness. He indicated that he owns Alaska . . . . And another time he reported that his mother owned Alaska. . . . That's a symptom of a mental illness; it's a delusion, a delusion of grandiosity . . . . Given his presentation, the comments he made, I felt that even though I had [little] interaction with him, his presentation was consistent with someone suffering from a mental illness, a psychotic disorder.

Using terminology from a manual of mental disorders, Dr. Pietz concluded that Mackey suffers from a "psychotic disorder not otherwise specified." *See Diagnostic*

*and Statistical Manual of Mental Disorders* 343 (Am. Psychiatric Ass'n ed., 4th ed. 2000).

Dr. Sarrazin interviewed Mackey in February 2012. Mackey came out of his cell and "spent some time" talking with the doctor. Dr. Sarrazin testified it was "quite clear from [his] interview with [Mackey] that he's delusional, disorganized in his thinking," and that Mackey made clear that he did not want to take medication. Dr. Sarrazin opined that administration of antipsychotic medication would be necessary to restore Mackey's competence to stand trial. He saw a substantial probability that the medication he recommended would render Mackey competent to stand trial, and that side effects of the medication would not impair Mackey's competency. Dr. Sarrazin said that medication would lead to marked improvement in other aspects of Mackey's life, including better personal hygiene and the ability to interact with peers. Both Dr. Sarrazin and Dr. Pietz testified that no less intrusive treatments are available to assist Mackey in regaining competency.

Following the hearing, the district court granted the government's motion to medicate Mackey involuntarily, if necessary. The court provided that "[i]f Mr. Mackey does not take the recommended medication voluntarily and the medical staff concludes involuntary administration is clinically appropriate, involuntary administration of anti-psychotic medication is ordered."

The district court observed that both experts diagnosed Mackey with a "psychotic disorder not otherwise specified," and noted that he suffers from delusions of grandeur. The court concluded that there was an "important governmental interest in this case, . . . both with regard to the public policy of the SORNA statute, and in Mr. Mackey's particular case." There was clear and convincing evidence, according to the court, "that the involuntary administration of medication, if necessary, will further the interest of restoring Mr. Mackey to competency" to stand trial. The court also found that involuntary medication is appropriate if necessary, and that there are

no less intrusive treatments available. Finally, the district court determined that "the administration of the drugs is medically appropriate and in Mr. Mackey's best medical interests in light of his medical condition," and that any side effects of the medication would not damage Mackey or interfere with his competency to stand trial.

Mackey timely appealed the district court's order. We have jurisdiction under the collateral order doctrine. *Sell*, 539 U.S. at 176-77.

## II.

In *Sell*, the Supreme Court concluded that the government may administer antipsychotic drugs involuntarily to render a mentally ill criminal defendant competent to stand trial for serious, but nonviolent, crimes. To order the administration of drugs, a court must find: (1) that an important governmental interest is at stake; (2) that involuntary medication will significantly further that governmental interest; (3) that involuntary medication is necessary to further that interest; and (4) that administration of the drugs is medically appropriate. *Id.* at 180-81. The district court in this case made each of the required findings. We review *de novo* a court's legal determination that important governmental interests are at stake. *United States v. Fazio*, 599 F.3d 835, 840 (8th Cir. 2010). The government must prove the other three elements by clear and convincing evidence, and we review the district court's findings for clear error. *Id.* at 840 & n.2.

On the first element, it is undisputed that the government has an important interest in bringing to trial an individual accused of a serious crime, *Sell*, 539 U.S. at 180, but Mackey argues that his offense was not serious, because it is merely a "non-violent, status offense." In determining the seriousness of the offense, we agree with those circuits that place the greatest weight on the maximum penalty authorized by statute, *see United States v. Green*, 532 F.3d 538, 546-49 & n.8 (6th Cir. 2008); *United States v. Palmer*, 507 F.3d 300, 303-04 (5th Cir. 2007); *United States v. Evans*,

404 F.3d 227, 238 (4th Cir. 2005), as it is the most relevant objective indication of the seriousness with which society regards the offense. *Blanton v. City of North Las Vegas*, 489 U.S. 538, 541 (1989). Congress established a maximum term of ten years' imprisonment for the offense of failure to register under SORNA, 18 U.S.C. § 2250(a), and that authorized punishment "is 'serious' under any reasonable standard." *Evans*, 404 F.3d at 238.

We disagree with Mackey's contention that so-called "status" offenses are not "serious" for purposes of *Sell*, or that the nature of the offense is a "special circumstance" that lessens the governmental interest in prosecution. *See Sell*, 539 U.S. at 180. SORNA is premised on a legislative determination that sex offenders who are not properly registered present a serious risk to the safety of the community. The registration provision was part of "a broader statutory scheme enacted to address deficiencies in prior law that had enabled sex offenders to slip through the cracks." *Carr v. United States*, 130 S. Ct. 2229, 2240 (2010). Even where the commission of an offense does not itself harm others directly, society may have a strong interest in prosecuting the violation and imposing punishment. *See Fazio*, 599 F.3d at 840 (holding that the "status" offense of firearm possession by a felon is a "serious" crime); *Green*, 532 F.3d at 549 (holding that drug trafficking is "serious" even when there is no identifiable victim); *United States v. Valenzuela-Puentes*, 479 F.3d 1220, 1226-27 (10th Cir. 2007) (holding that unlawful reentry to the United States is a "serious crime"); *United States v. Cuevas-Ramirez*, 501 F. App'x 814, 820 (10th Cir. 2012) (rejecting argument that "status" offense of illegal reentry is not "serious.").

Mackey contends that other special circumstances lessen the importance of the governmental interests in his case. He argues that even if medication renders him competent to stand trial, he is likely to be found not guilty by reason of insanity and civilly committed, such that the government's interest in confinement will be satisfied. Civil commitment, however, is not a substitute for a criminal trial, and the potential for that type of confinement does not totally undermine the government's interest in

-6-

prosecution. *Sell*, 539 U.S. at 180. In this case, moreover, the record does not demonstrate a strong likelihood of civil commitment. That Mackey was delusional at the time of his arrest does not necessarily mean that he could mount a successful insanity defense; at this time, Mackey has not even noticed an intent to pursue such a defense. *See* Fed. R. Crim. P. 12.2(a). Long-term civil commitment could be justified, after a finding of insanity, only on a showing that Mackey presents "a substantial risk of bodily injury to another person or serious damage to property of another." 18 U.S.C. § 4246(d)(2). Mackey does not concede that this standard would be satisfied. Given the uncertainty of civil commitment and the government's interest in timely prosecution, the interest in prosecuting Mackey remains strong.

Nor are we convinced that the governmental interest in prosecution is substantially weakened by the amount of time that Mackey has been detained pending trial. Given the advisory nature of the sentencing guidelines, *see United States v. Booker*, 543 U.S. 220, 258-65 (2005), and the broad discretion of district courts to sentence within the statutory range based on their personal sentencing philosophies, *see Gall v. United States*, 552 U.S. 38, 46 (2007); *United States v. Bueno*, 549 F.3d 1176, 1182 (8th Cir. 2008), we cannot blithely assume that Mackey's proposed advisory guideline range of 24-30 months' imprisonment is likely to be the ultimate sentence imposed if Mackey were convicted. At this stage, it is impossible to know whether a sentencing court would conclude that a term closer to the statutory maximum of ten years' imprisonment is warranted. *Cf. United States v. Nicklas*, 623 F.3d 1175, 1179 n.5 (8th Cir. 2010) ("We decline to rely heavily upon a 'sentencing proceeding . . . [conducted] without the benefit of a presentence report and the facts necessary to conduct such a proceeding.'") (quoting *United States White*, 620 F.3d 401, 428-29 (4th Cir. 2010) (Niemeyer, J., dissenting)). And a term of imprisonment is not the only sanction available in a criminal prosecution. A criminal sentence also must include a term of supervised release of at least five years and extending up to the rest of Mackey's life. *See* 18 U.S.C. § 3583(k). This sanction—not available in a civil commitment proceeding—furthers the government's interest in monitoring sex

offenders who have demonstrated an unwillingness to comply with the registration requirements of SORNA. In any event, the fact of pretrial confinement that may approach the likely term of imprisonment in a criminal case "does not totally undermine . . . the strength of the need for prosecution." *Sell*, 539 U.S. at 180.

Mackey also complains that the district court improperly considered his potential dangerousness when it remarked that SORNA enables "people in the local community [to] protect themselves and assure community safety in working with law enforcement to know the identity and whereabouts of sex offenders such as Mr. Mackey." This objection misunderstands the *Sell* inquiry into governmental interest. To be sure, the Court in *Sell*, *id.* at 181-82, explained that the government sometimes uses involuntary medication to pursue interests independent of bringing an accused to trial; one such interest is to reduce danger that an inmate poses to himself or others while incarcerated. *See Washington v. Harper*, 494 U.S. 210, 225-26 (1990). But the district court here did not rely on an interest in addressing any danger that Mackey posed to himself or others *while confined*. The court, rather, focused on the government's interest in protecting *the public* through prosecution of an accused who posed a danger to the community by failing to comply with the registration requirements of SORNA. This sort of dangerousness is a proper consideration when determining the importance of the governmental interest under *Sell*. *See United States v. Ruiz-Gaxiola*, 623 F.3d 684, 694 n.6 (9th Cir. 2010); *United States v. Gomes*, 387 F.3d 157, 160 (2d Cir. 2004).

On the second *Sell* element, Mackey argues that the district court clearly erred in finding that it was satisfied. He contends that there was insufficient evidence to conclude that antipsychotic medication is substantially likely to restore Mackey's competency to stand trial and substantially unlikely to have significant side effects. Mackey believes that his medical condition is an unusual "grandiose delusional disorder," and that the experts were not equipped to address how medication would affect this condition. Mackey relies on *United States v. White*, 620 F.3d 401, 421 (4th

Cir. 2010), where a divided panel concluded that the record did not support a finding that involuntary medication was likely to be effective in treating a woman with delusional disorder of the grandiose type.[2]

We find no clear error in the district court's finding that involuntary medication would significantly further the government's interest in prosecution of this case. The district court accepted the testimony of Dr. Pietz that Mackey "will be restored to competency" with proper medication, and the opinion of Dr. Sarrazin that there is a "substantial probability that [Mackey] would be restored to competency with involuntary antipsychotic medication." Dr. Sarrazin also opined that the "nuisance side effects" of such medication—which could include sedation, light-headedness, and dry mouth—usually dissipate quickly and "would not impair [Mackey's] ability to be competent."

Mackey's counsel questioned both experts about the decision in *White*. Dr. Pietz disagreed with the proposition that "people [who] suffer from delusional disorders, particularly of the grandiosity type, rarely respond to medication," saying that she has worked with persons suffering from delusional orders who have responded favorably to medication and been restored to competency. Dr. Sarrazin disagreed with the suggestion that "delusional disorders . . . often do not respond to medication or often have poor response results from medication." Based on his experience and review of literature, he opined that "psychotic illnesses do respond to antipsychotics," and that such medications "would be the treatment of choice for delusional disorders." The expert in *White*, by contrast, was skilled in treating schizophrenia, not delusional disorders; she had never treated a patient with the defendant's delusional disorder; she conceded that she really did not know how the

---

[2]Mackey also asserts that his "unique medical condition" lessens the governmental interest in prosecution for purpose of the first *Sell* element, but the likelihood of successful treatment is properly addressed under the second element. 539 U.S. at 181.

female defendant would respond to antipsychotic medications; and she relied heavily on a study with only male subjects, despite literature suggesting that men and women often react differently to medications. *White*, 620 F.3d at 421. Mackey has not demonstrated that it was impermissible for the district court to credit the more persuasive testimony of the experts in this case.

Mackey does not challenge the district court's finding on the third *Sell* factor. On the fourth, he contends that administration of antipsychotic drugs is not medically appropriate. Again, however, the district court reasonably credited the expert testimony. Dr. Sarrazin, who would be the prescribing physician, specified the medications that would be employed, and explained that they are used daily in the United States to treat psychotic illness. He testified that most of the anticipated side effects are nuisances that usually end within three or four days. The medical facility also would monitor the patient for increased lipids or increased glucose that might result, and mitigate these effects as necessary. More generally, Dr. Sarrazin testified that the medication not only would restore Mackey's competency to stand trial, but would allow the patient—who was not showering, recreating, or communicating with staff—to "have a better quality of life and to kind of move forward." Mackey presented no countervailing evidence. It was not clear error for the court to find that the proposed treatment plan is medically appropriate and in Mackey's best medical interests.

*     *     *

The order of the district court is affirmed.

_____