# United States Court of Appeals
## For the Eighth Circuit

_____

No. 13-2085
_____

United States of America

*Plaintiff - Appellee*

v.

James S. Curtis

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Western District of Arkansas - Ft. Smith

_____

Submitted: January 17, 2014
Filed: April 16, 2014

_____

Before WOLLMAN, BYE, and MELLOY, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

James Curtis was indicted on one count of possession of a firearm after having been committed to a mental institution, in violation of 18 U.S.C. § 922(g)(4). Curtis was found incompetent to stand trial, and he objected to treatment with antipsychotic medication to restore him to competency. The district court ordered that Curtis be involuntarily medicated. We conclude that the case must be remanded to the district court for further proceedings.

## I. Background

Curtis is a 74-year-old man who suffers from delusional disorder, persecutory type. This psychotic mental illness is primarily characterized by nonbizarre delusions—specifically, the person believes "that he is being conspired against, cheated, spied on, followed, poisoned or drugged, maliciously maligned, harassed, or obstructed in the pursuit of long-term goals." According to a government evaluation of Curtis's condition, Curtis has a "fixed, irrational belief that the police in Kentucky follow him across the country, steal from him, and are involved in a cover-up regarding the death of his friend. His ideas have expanded to include the Judge assigned to his case."

### A. Curtis's History of Mental Illness

Curtis began exhibiting symptoms of delusional disorder as early as March 2009 after he fell from a ladder and lost consciousness. Curtis was hospitalized because he suffered from recurring nausea and vomiting. He underwent a CT scan that revealed "mild deep white matter disease." Curtis's wife reported that Curtis's mood and personality had changed dramatically after the injury; Curtis no longer trusted people, became apathetic, and absconded from home for lengthy periods of time.

In April 2010, police officers were dispatched to Curtis's residence following a domestic dispute call. Curtis and his neighbor were arguing, and when the officers arrived, Curtis threatened them with a gun. Curtis was taken into custody and was later ordered to be evaluated by Western State Hospital in Kentucky, where he was hospitalized for nine days. Curtis was diagnosed with delusional disorder and prescribed a daily dose of two milligrams of risperidone, which was administered orally. At discharge, Curtis was "able to carry on a reality based conversation without evidence of paranoid ideas." The Discharge Summary recommended that "no guns

be in the home ever again." Curtis's wife removed more than 200 firearms from their residence before Curtis returned home.

In March 2011, Curtis was again ordered to be hospitalized for a mental examination. The hospital report indicated that Curtis did not display any psychotic symptoms. At the time of the evaluation, Curtis was not taking any antipsychotic medication.

## B. Curtis's Indictment

On January 29, 2012, Curtis was arrested when police officers found him parked in front of the United States Attorney's Office for the Western District of Arkansas with firearms and ammunition inside his vehicle. The magistrate judge thereafter ordered a mental evaluation of Curtis. On April 9, 2012, a jury indicted Curtis on one count of possession of a firearm after having been committed to a mental institution. Randall Rattan, Ph.D., the primary evaluating psychologist at the Federal Correctional Institution in Fort Worth, Texas, evaluated Curtis to determine whether he was competent to stand trial. Dr. Rattan diagnosed Curtis with delusional disorder, persecutory type, and concluded that Curtis was incompetent to proceed to trial.

Based on Dr. Rattan's report and Curtis's testimony at the competency hearing, the magistrate judge concluded that Curtis was incompetent to stand trial. The magistrate judge recommended that Curtis be committed to the custody of the attorney general to be hospitalized for treatment and for evaluation to determine if he could attain the capacity to move forward in the criminal proceedings. The district court adopted the magistrate judge's report and recommendation.

Curtis was then committed to the Federal Medical Center in Butner, North Carolina. Angela Weaver, Ph.D., a forensic psychologist, evaluated Curtis, with

psychiatric consultation by Robert Lucking, M.D., a staff psychiatrist. Drs. Weaver and Lucking confirmed the diagnosis of delusional disorder, persecutory type. Their report concluded that Curtis remained incompetent to stand trial but opined that there was a substantial probability that Curtis's competency could be restored through the administration of antipsychotic medication. Because Curtis refused treatment, the report recommended that he be involuntarily medicated. Based on the report, the magistrate judge recommended that Curtis be involuntarily medicated to restore him to competency.

Curtis objected and requested a hearing pursuant to Sell v. United States, 539 U.S. 166 (2003). At the hearing, Drs. Weaver and Lucking's report was admitted into evidence, and Dr. Lucking testified via telephone. The magistrate judge issued an amended report and recommendation, in which he found that the government had met its burden of proving each of the Sell factors by clear and convincing evidence. Accordingly, the magistrate judge recommended that the district court grant the government's request to involuntarily medicate Curtis with an injection of twenty-five milligrams of risperidone every two weeks for a period of up to four months. Curtis filed objections to the report and recommendation. The district court denied Curtis's objections and adopted the magistrate judge's amended report and recommendation in its entirety. The district court stayed the imposition of its order pending this interlocutory appeal.

## II. Discussion

In Sell v. United States, the United States Supreme Court considered long-standing precedent regarding a defendant's constitutional right to refuse medical treatment. 539 U.S. 166, 177-80 (2003). The Court held that, in certain circumstances, "the Constitution permits the Government involuntarily to administer antipsychotic drugs to a mentally ill defendant facing serious criminal charges in order to render that defendant competent to stand trial[.]" Id. at 179-80. The Court

-4-

articulated a four-factor test for determining the circumstances in which the government may obtain a court order to involuntarily medicate a defendant to render him competent to stand trial. The test requires a court to find: "(1) that an important governmental interest is at stake; (2) that involuntary medication will significantly further that governmental interest; (3) that involuntary medication is necessary to further that interest; and (4) that administration of the drugs is medically appropriate." United States v. Mackey, 717 F.3d 569, 573 (8th Cir. 2013) (citing Sell, 539 U.S. at 180-81).

Curtis challenges the district court's findings that the government had satisfied the second and fourth factors of the Sell test. He claims that the government failed to prove that involuntary medication would "significantly further" its interest or that it is "medically appropriate" for him. The government must prove those factors by clear and convincing evidence, and we review the district court's findings on those factors for clear error. Mackey, 717 F.3d at 573.

## A.  The Second Sell Factor

To show that involuntary medication will "significantly further" the government's interest under the second Sell factor, the government must establish by clear and convincing evidence that involuntary medication is both (1) "substantially likely to render the defendant competent to stand trial" and (2) "substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense[.]" Sell, 539 U.S. at 181.

We conclude that the district court did not clearly err in finding that the involuntary administration of risperidone would significantly further the government's interest in prosecuting this case. The district court accepted the testimony of Dr. Lucking that antipsychotic medication is substantially likely to render Curtis competent to stand trial. Dr. Lucking based his opinion on the following evidence.

First, Curtis was treated with two milligrams of risperidone daily when he was hospitalized at Western State Hospital, and at discharge Curtis "was described as being able to carry on a reality based conversation without evidence of paranoid ideas." Dr. Lucking found this to be direct evidence from which to infer that Curtis would respond to antipsychotic medication. Second, Dr. Lucking relied on recent medical studies and literature that indicate that psychotic illnesses, including delusional disorder, can be treated effectively with antipsychotic medication. Dr. Lucking also opined that treatment with risperidone is substantially unlikely to produce side effects that would interfere with Curtis's ability to assist his attorney in preparing a defense.

Curtis contends that Dr. Lucking's opinion that antipsychotic medication is substantially likely to render him competent to stand trial is unsubstantiated and contrary to medical studies and literature. Curtis first asserts that "it is impossible to definitively conclude that [he] benefitted from risperidone during his . . . hospitalization" at Western State Hospital. Curtis also asserts that medical studies and literature demonstrate that antipsychotic medication is ineffective in treating delusional disorder. Curtis points to United States v. Ghane, 392 F.3d 317 (8th Cir. 2004), in which we reversed the district court's Sell order because the expert testimony provided by Dr. Lucking and other psychiatrists established that antipsychotic medication was ineffective in treating delusional disorder and had only a five to ten percent chance of restoring competency.

Curtis's counsel cross-examined Dr. Lucking at great length on the considerations that formed the basis of his opinion. Curtis's counsel explored the possibility that Curtis's ability to carry on a reality based conversation at the end of his nine day hospitalization at Western State Hospital was not the result of his being treated with risperidone. Dr. Lucking acknowledged that his report stated that risperidone "does not begin to exert its therapeutic effect for several weeks after the first injection" but explained that the length of time it takes for risperidone to exert its

-6-

effect varies on an individual basis and that he has seen patients respond with only one dose. Further, Dr. Lucking stated that it was unlikely that Curtis had deluded the evaluator.

Dr. Lucking also acknowledged that he had held a different opinion about the effectiveness of antipsychotic medications in treating delusional disorder when he testified in Ghane. But he explained that he had changed his opinion as a result of reviewing recent medical studies and literature. Dr. Lucking's report pointed to recent medical studies and literature that provide evidence that individuals with delusional disorder achieve positive results after being treated with antipsychotic medication. Among the studies that Dr. Lucking cited was a 2007 article by Drs. Herbel and Stelmach (the Herbel Study), which found that after involuntary treatment with antipsychotic medication, seventy-seven percent of defendants with delusional disorder were restored to competency.[1]

We are charged with deciding whether the district court's findings were clearly erroneous based on the evidence and testimony before it. Dr. Lucking substantiated his opinion before the district court that risperidone would be effective in restoring Curtis to competency, and the district court found him credible. Dr. Lucking also substantiated his opinion that treatment with risperidone is substantially unlikely to produce side effects that would interfere with Curtis's ability to assist his attorney in preparing a defense. Notwithstanding the Ninth Circuit's skepticism regarding the Herbel Study, we conclude that the district court's decision to credit Dr. Lucking's report and testimony was not clearly erroneous, since it constituted a permissible view of the evidence presented to it.

---

[1]As Curtis points out in his Reply Brief, the Ninth Circuit concluded that "the findings of the Herbel Study are both limited and tentative" and that "they do not constitute clear and convincing evidence that involuntarily medicating [the defendant] . . . is substantially likely to restore him to competency[.]" United States v. Ruiz-Gaxiola, 623 F.3d 684, 698 (9th Cir. 2010).

-7-

## B. The Fourth Sell Factor

The fourth Sell factor requires the government to prove by clear and convincing evidence that "administration of the drugs is *medically appropriate, i.e.*, in the patient's best medical interest in light of his medical condition." Sell, 539 U.S. at 181.

In finding that the government had satisfied the fourth Sell factor by clear and convincing evidence, the district court relied upon the following: Dr. Lucking's opinion that antipsychotic medication is substantially likely to render Curtis competent to stand trial and the basis for that opinion; Dr. Lucking's opinion that treatment with antipsychotic medication is substantially unlikely to produce side effects that would interfere with Curtis's ability to assist his attorney in preparing a defense; Dr. Lucking's opinion that antipsychotic medication would not adversely interact with Curtis's other medications; Dr. Lucking's testimony that the possible symptoms of the side effects of risperidone can be addressed with medication; and Dr. Lucking's testimony that patients treated at the facility are closely monitored for adverse reactions to medication. The district court also noted that it found compelling the fact that Curtis had been previously treated with risperidone at Western State Hospital without any indication of an adverse reaction.

The foregoing evidence primarily supports the second Sell factor, which requires the district court to determine whether the medication is "substantially likely to render the defendant competent to stand trial" and "substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense[.]" Id. In contrast, the fourth Sell factor requires the district court to consider all of the circumstances relevant to the particular defendant and to consider the entirety of the consequences of the proposed involuntary medication. See, e.g., Ruiz-Gaxiola, 623 F.3d at 704-05; United States v. Evans, 404 F.3d 227, 242 (4th Cir. 2005). The district court did not consider the circumstances

relevant to such a required finding, such as Curtis's need for long-term treatment and Curtis's current quality of life. See, e.g., Mackey, 717 F.3d at 576 (recognizing that as to the fourth Sell factor the testifying doctor opined that "the medication not only would restore [the defendant's] competency to stand trial, but would allow the patient—who was not showering, recreating, or communicating with staff—to 'have a better quality of life and to kind of move forward'"); Ruiz-Gaxiola, 623 F.3d at 705 (discussing the defendant's positive quality of life and questioning the value of the medication's potential benefits when weighed against the likelihood and severity of its potential harms over the course of the treatment). In the absence of a specific determination by the district court whether administering risperidone constitutes a medically appropriate treatment for Curtis, as required by the fourth Sell factor, there is no finding for us to review, and thus remand is required.

### III. Conclusion

We hold that the district court did not err in finding that the government had satisfied the second Sell factor. We remand the case to the district court with directions that it determine whether the government has established by clear and convincing evidence that involuntarily administering the recommended medication regime to Curtis is medically appropriate.

_____