# United States Court of Appeals
## For the Eighth Circuit

_____

No. 20-1156
_____

United States of America

*Plaintiff - Appellee*

v.

Matthew H. Coy

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: January 12, 2021
Filed: March 17, 2021

_____

Before COLLOTON, WOLLMAN, and SHEPHERD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

Matthew H. Coy, who suffers from amphetamine-induced psychotic disorder, with onset during intoxication, was charged with unlawful possession of a firearm by a convicted felon. The district court[1] found Coy incompetent to stand trial, and

---

[1]The Honorable Gary A. Fenner, United States District Judge for the Western District of Missouri, adopting the report and recommendations of the Honorable

after Coy declined medication, the government moved to begin involuntary treatment under Sell v. United States, 539 U.S. 166 (2003). The district court granted the government's motion, and Coy now appeals. Having "jurisdiction over interlocutory appeals of orders for involuntary medication under the collateral order doctrine," United States v. Nicklas, 623 F.3d 1175, 1177 (8th Cir. 2010), we affirm.

I.

After being charged by criminal complaint, Coy was indicted on two counts of unlawful possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(1). Coy and his mother had an altercation, which resulted in a gunshot wound to Coy's leg. Coy was treated at a medical center and was described as: having "an altered mental status"; "exhibiting delirium"; and "screaming random statements." R. Doc. 36, at 5. While Coy was being treated, police found two firearms in his residence. Coy claims that his mother shot him as part of a large conspiracy aimed against him; his mother claims that Coy had taken methamphetamine, attacked her, and shot himself in his delirium.

Coy filed a motion for determination of competency. After a psychological evaluation, Dr. Jeremiah Dwyer, a forensic psychologist, noted that while Coy's exam was largely unremarkable, Coy would be unable to assist in his trial due to his delusions regarding his mother, law enforcement, and medical personnel. The magistrate judge recommended that an order of incompetency be entered and that Coy be committed to the custody of the Attorney General for treatment at a federal medical center (FMC Butner) for four months, a recommendation which the district court adopted in full.

After the first ordered period at FMC Butner ended, Dr. Robert Cochrane, the primary psychologist, filed a report with the district court stating that Coy's

Lajuana M. Counts, United States Magistrate Judge for the Western District of Missouri.

-2-

delusions had persisted, and the district court extended the treatment another four months. Shortly thereafter, Dr. Cochrane notified the district court that Coy had declined further medication, and the government requested authority to begin involuntary treatment under Sell. The magistrate judge recommended that the district court enter a finding that there were important government interests at stake, the first element under Sell, based on the seriousness of Coy's crime. The district court adopted the recommendation in full and ordered the staff of FMC Butner to prepare an "Addendum and Treatment Plan" to address the other Sell elements.

The magistrate judge subsequently held an evidentiary hearing on the three remaining Sell elements. Dr. Logan Graddy, the chief psychiatrist at FMC Butner, submitted the requested "Addendum and Treatment Plan" (the Treatment Plan). In the Treatment Plan, Dr. Graddy determined that Coy suffered from amphetamine-induced psychotic disorder, with onset during intoxication, and that the disorder's impact on Coy's life was "moderate to severe." R. Doc. 71, at 2. The Treatment Plan contained Dr. Graddy's findings:

> 3. My opinions related to these matters:
>
> * * *
>
> b. In regards to [element] 2:
>
>> i. I have no opinion as to whether involuntary medication will significantly further government/state interests.
>>
>> ii. In my opinion, with reasonable medical certainty, involuntary medications are substantially likely to render Mr. Coy competent to stand trial.
>>
>> iii. In my opinion, with reasonable medical certainty, involuntary medication is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense.

c. In regards to [element] 3:

   i. I have no opinion as to whether involuntary medication is necessary to further government/state interests.

   ii. In my opinion, alternative, less intrusive treatments are unlikely to achieve substantially the same results as involuntary medication.

   iii. I have no opinion as to whether less intrusive means (court order backed by contempt order) will achieve substantially the same results as involuntary medication.

   d. In regards to [element] 4: It is my opinion that administering antipsychotic medication to Mr. Coy is medically appropriate. It is in his best medical interest in light of his medical condition.

R. Doc. 71, at 5-6 (footnote omitted). The Treatment Plan further noted that Coy had voluntarily taken antipsychotic medication while at FMC Butner but that he "ha[d] been reluctant to take the medications at sufficient doses or for a sufficient period of time to treat his disorder." R. Doc. 71, at 3. Coy's reluctance stemmed from his belief that "the treatment team was trying to poison him or part of the conspiracy against him." R. Doc. 71, at 4.

Dr. Graddy also submitted an appendix of studies to the Treatment Plan, the purpose of which was "to provide the [district c]ourt [with] helpful scientific information to be used in weighing the potential risks and benefits of a trial of treatment." R. Doc. 71-1, at 1. The appendix largely referenced schizophrenia, but it also included data on other psychotic disorders, such as delusional disorder. The appendix summarized the data, stating: "[T]he effectiveness of antipsychotic medication in treating schizophrenia and related psychotic disorders has been repeatedly demonstrated in published professional literature for nearly 50 years, and is considered an essential element in the treatment of these conditions." R. Doc. 71-1, at 3. The appendix further discussed the myriad side effects associated with antipsychotic medications and outlined the proposed monitoring procedures FMC

Butner would take and the responses the clinic would implement should such side effects manifest.

At the evidentiary hearing, Dr. Graddy testified on behalf of the government and adopted the Treatment Plan as his direct testimony. He testified that he was board certified in general psychiatry and addiction medication and was a distinguished fellow in the American Psychiatric Association. Dr. Graddy testified that in compiling the Treatment Plan he had relied on his correspondence with Coy's nurse practitioner, a clinical pharmacist, and Dr. Cochrane (the primary psychologist), in addition to his own observations of Coy, which totaled about two hours. Dr. Graddy testified that he had experience treating individuals with conditions similar to Coy's. While he was unable to recall these patients' specific outcomes, Dr. Graddy noted that he had treated amphetamine-induced psychotic disorder similar to schizophrenia. On cross-examination, Dr. Graddy acknowledged that Coy had claimed that he had experienced side effects from the voluntarily-accepted antipsychotic medication, but Dr. Graddy was unable to state whether Coy actually experienced those side effects.

To rebut Dr. Graddy, Coy called Dr. Roger Sommi, a psychiatric pharmacist who serves as a professor of psychiatry and pharmacy, to testify. Dr. Sommi testified that in his academic role he conducted research and made drug therapy recommendations to psychiatrists. While Dr. Sommi testified that he had worked with "hundreds" of patients that had a condition similar to Coy's, see R. Doc. 81, at 26, he admitted that he had not met with Coy personally and was merely basing his opinions on Coy's medical records. Based on Dr. Graddy's diagnosis, Dr. Sommi opined that there was a "low probability" that antipsychotic medication would alleviate Coy's delusions given their persisting nature. R. Doc. 81, at 28. Dr. Sommi acknowledged that if Coy was willing, he would likely take the same approach as Dr. Graddy. On cross-examination, Dr. Sommi admitted that there was a possibility that the Treatment Plan could render Coy competent. He also testified that, in a clinical setting, the opinion of a psychiatrist or nurse practitioner would prevail over his as a psychiatric pharmacist if a disagreement as to a patient's treatment arose.

The magistrate judge subsequently issued a report and recommendation, recommending Coy's involuntary medication. The magistrate judge relied on Dr. Graddy's testimony, which was based on his personal interactions with Coy, in finding that involuntary medication was substantially likely to restore Coy to competency and that any resulting side effects could be managed with medication. The magistrate judge noted that while Dr. Sommi was less optimistic about the viability of the Treatment Plan, portions of Dr. Sommi's testimony were supportive of Dr. Graddy's proposed plan. The magistrate judge referenced the appendix of studies with approval. The magistrate judge also found that the Treatment Plan included sufficient flexibility to adequately accommodate any side effects such that the Treatment Plan was medically appropriate for Coy. The district court adopted the report and recommendation in full and ordered the commencement of Coy's involuntary medication. Coy appeals.

II.

"In <u>Sell v. United States</u>, the United States Supreme Court considered longstanding precedent regarding a defendant's constitutional right to refuse medical treatment." <u>United States v. Curtis</u>, 749 F.3d 732, 735 (8th Cir. 2014) (citing <u>Sell</u>, 539 U.S. at 177-80). "[T]he Supreme Court concluded that the government may administer antipsychotic drugs involuntarily to render a mentally ill criminal defendant competent to stand trial for serious, but nonviolent, crimes." <u>United States v. Mackey</u>, 717 F.3d 569, 573 (8th Cir. 2013). "The [Supreme] Court articulated a four-[element] test for determining the circumstances in which the government may obtain a court order to involuntarily medicate a defendant to render him competent to stand trial." <u>Curtis</u>, 749 F.3d at 735. Those elements are: "(1) that an important governmental interest is at stake; (2) that involuntary medication will significantly further that governmental interest; (3) that involuntary medication is necessary to further that interest; and (4) that administration of the drugs is medically appropriate." <u>Mackey</u>, 717 F.3d at 573.

-6-

Coy challenges the district court's findings only as to the second and fourth Sell elements, which the government must prove by clear and convincing evidence. See id. As these Sell elements are factual in nature, see United States v. Fazio, 599 F.3d 835, 839-40 (8th Cir. 2010), we review the district court's determinations for clear error, id. at 840; see also Mackey, 717 F.3d at 573. "Under the clear-error standard of review, this [C]ourt may not reverse the findings of the district court simply because it would have weighed the evidence differently or decided the case differently if sitting as the trier of fact." Schaub v. VonWald, 638 F.3d 905, 920 (8th Cir. 2011) (citing Anderson v. City of Bessemer City, 470 U.S. 564, 573 (1985)). "This [C]ourt will affirm 'the district court's account of the evidence' if it is 'plausible in light of the record viewed in its entirety.'" United States v. Dico, Inc., 920 F.3d 1174, 1178 (8th Cir. 2019) (quoting Schaub, 638 F.3d at 915).

A.

To satisfy the second Sell element, "the court must conclude that involuntary medication will *significantly further*" the state interests as articulated under the first Sell element. Sell, 539 U.S. at 181. To do so, "the government must establish by clear and convincing evidence that involuntary medication is both (1) 'substantially likely to render the defendant competent to stand trial' and (2) 'substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense.'" Curtis, 749 F.3d at 735 (quoting Sell, 539 U.S. at 181).

Coy argues that the government failed to provide evidence specifically tailored to his condition to show that antipsychotic medication was substantially likely to render him competent to stand trial. Specifically, he points to Dr. Graddy's alleged inexperience with amphetamine-induced delusional disorder (relative to Dr. Sommi's experience) and Dr. Graddy's inability to recall outcomes of patients who were similar to Coy. Coy also argues that the appendix of studies focuses broadly on schizophrenia and delusional disorders, whereas Dr. Sommi testified that

-7-

Coy falls into a rare subgroup that maintains persisting delusions that are unaffected by antipsychotic medication.

While an individual's history with the proposed medication and studies tailored to the individual's specific mental illness are beneficial in determining the efficacy of the proposed treatment plan, we have never held that such minutely calibrated evidence is necessary for the government to carry its burden under the second Sell element. Such a requirement would virtually bar the government from involuntarily medicating a defendant with a rare, understudied mental illness even though a physician, based on his or her experience with similar illnesses, would opine with reasonable medical certainty that involuntary medication would render the defendant competent. Instead, the bar is no higher than what the Supreme Court set out in Sell: the government must show that the proposed treatment plan is "substantially likely to render the defendant competent to stand trial." 539 U.S. at 181. The government, however, is free to choose the means by which it carries that burden.

Even so, the record establishes that Coy's Treatment Plan *was* individually tailored to him. Dr. Graddy authored the Treatment Plan after personally observing Coy, reviewing his medical history, and consulting the medical care team that had been overseeing Coy's treatment at FMC Butner. Coy ultimately faults the district court for favoring Dr. Graddy's testimony over Dr. Sommi's. Nothing in the record indicates that the district court's acceptance of Dr. Graddy's testimony was clear error. See Fazio, 599 F.3d at 841. While Dr. Sommi may have had significant interaction with individuals with substance-induced delusional disorder, he did not make an in-person assessment of Coy. He contested the efficacy of the Treatment Plan but admitted that if Coy was willing to be medicated, Dr. Graddy's approach was the proper way to proceed. And, as Dr. Sommi acknowledged, if the two doctors were both serving on the team treating Coy, Dr. Graddy's opinion would control under the law. To the extent that conflicts existed between the opinions of the experts, the district court "is entitled to resolve such evidentiary conflicts." Id. Once the district court accepted Dr. Graddy's medical opinion that the Treatment Plan was

substantially likely to restore Coy to competency for trial, the government met its burden.  See id.

The record further supports the district court's finding that any side effects resulting from involuntary medication were substantially unlikely to interfere with Coy's ability to participate in his defense.  Dr. Graddy testified that such interference was substantially unlikely.  The appendix of studies outlined in detail the probability of various side effects and the ability to treat them through other medications.  Dr. Sommi further opined on the possibility of certain side effects, but he did not dispute that those side effects could be managed through the means set forth in the appendix.  Therefore, the government met its burden in demonstrating that the Treatment Plan was substantially unlikely to produce side effects that would significantly inhibit Coy's ability to participate in his defense.  Accordingly, we find that the district court did not clearly err in finding that the Treatment Plan will significantly further the important state interests.

B.

To satisfy the fourth Sell element, "the government [must] prove by clear and convincing evidence that 'administration of the drugs is *medically appropriate*, *i.e.*, in the patient's best medical interest in light of his medical condition.'"  Curtis, 749 F.3d at 737 (quoting Sell, 539 U.S. at 181).  This element "requires the district court to consider all of the circumstances relevant to the particular defendant and to consider the entirety of the consequences of the proposed involuntary medication." Id.  Accordingly, the district court must refrain from a myopic analysis consisting only of the defendant's health at trial but must additionally consider relevant circumstances such as "[the defendant]'s need for long-term treatment and [his] current quality of life."  Id.

While Dr. Graddy testified that the Treatment Plan was in Coy's best interest, Coy argues that "[h]is quality of life is not significantly diminished by his delusional beliefs."  Appellant's Br. 42.  Even if we agree with Coy that his quality of life is

not significantly diminished by delusions, that does not render clearly erroneous the district court's finding that antipsychotic medication is in Coy's best interest. See Schaub, 638 F.3d at 920. Of course, the alleviation of a delusion, even for the sake of trial, is nonetheless beneficial to Coy. See Mackey, 717 F.3d at 576 (finding that involuntary medication "would allow the patient—who was not showering, recreating, or communicating with staff—to 'have a better quality of life and to kind of move forward'" in addition to restoring his competency to stand trial); see also United States v. James, 959 F.3d 660, 668 (5th Cir. 2020) (rejecting the argument that "the government's interest in restoring [the defendant] to competency is entirely separate from [the defendant's] medical interest"). In Coy's case, it was his delusion that allegedly brought about the altercation with his mother and a gunshot wound to his leg. Thus, by seeking to alleviate Coy's delusions, the Treatment Plan serves not only the government's interest but also Coy's in that it seeks to allow him to function in society without the looming fear of a widespread conspiracy against him. See James, 959 F.3d at 668.

Coy's position is that if, as he argued above, antipsychotic medication is ineffective against his persisting delusions, then the Treatment Plan will subject him to the risk of side effects without any benefit of returning him to competency. Unlike the defendant in United States v. Mackey, "who was not showering, recreating, or communicating with staff," see 717 F.3d at 576, Coy apparently functioned quite normally while institutionalized, R. Doc. 51, at 6. Thus, Coy argues that antipsychotic drugs would only risk further disrupting his life. However, having found that the district court did not err in determining that involuntary medication was substantially likely to render Coy competent, we must reject his argument. Further, Dr. Graddy determined that the magnitude of the symptoms of Coy's disorder is "moderate to severe," and that "[t]he overall magnitude of the impact of the disorder on his life is moderate to severe." R. Doc. 71, at 2. The magistrate judge also approvingly noted the flexibility of the Treatment Plan, which would allow the treatment team to properly respond to the effects of the medication, especially undesired side effects that might arise. Accordingly, we find that the

district court did not clearly err in finding that involuntary medication is medically appropriate for Coy.

## III.

The order of the district court is affirmed.

_____