# United States Court of Appeals
## For the Eighth Circuit

_____

No. 21-1174
_____

United States of America

*Plaintiff - Appellee*

v.

Johnathan Dewayne Mitchell

*Defendant - Appellant*
_____

Appeal from United States District Court
for the Northern District of Iowa – Cedar Rapids
_____

Submitted: June 15, 2021
Filed: August 25, 2021
_____

Before LOKEN, KELLY, and ERICKSON, Circuit Judges.
_____

KELLY, Circuit Judge.

Johnathan Mitchell was indicted in April 2016 for Hobbs Act robbery, see 18 U.S.C. § 1951, and is currently detained pending trial. On January 21, 2021, the district court[1] ordered that Mitchell—who has been diagnosed with schizophrenia and antisocial personality disorder—be involuntarily medicated pursuant to Sell v.

---

[1]The Honorable Leonard T. Strand, Chief Judge, United States District Court for the Northern District of Iowa.

United States, 539 U.S. 166 (2003), to maintain his competency for trial. See id. at 180 (holding that "involuntary administration of drugs solely for trial competence purposes" is permitted "in certain instances"). We affirm. See United States v. Coy, 991 F.3d 924, 926 (8th Cir. 2021) (noting that we "[h]av[e] jurisdiction over interlocutory appeals of orders for involuntary medication under the collateral order doctrine" (cleaned up)).

I.

Since being detained on the Hobbs Act charge, Mitchell has twice been found incompetent to stand trial. Defense counsel first moved to have Mitchell's competency evaluated in July 2016. The next month, after a 30-day evaluation period, then-Chief Magistrate Judge Jon Stuart Scoles found Mitchell incompetent and committed him to the Bureau of Prisons' (BOP) medical facility in Springfield, Missouri, for competency restoration. In September 2017, based on a July 2017 BOP psychologist's report that Mitchell's competency had been restored, the magistrate judge found Mitchell competent to stand trial.

Fewer than two months later, however, defense counsel again moved for an evaluation of Mitchell's competency, reporting that Mitchell had stopped taking his medication and had begun engaging in "unusual behavior." Magistrate Judge Kelly K.E. Mahoney granted the motion. After a 30-day evaluation period, a BOP psychologist opined that Mitchell's time in transit to the BOP medical facility in Butner, North Carolina, contributed to his decompensation.[2] In February 2018, the magistrate judge found Mitchell incompetent and committed him for competency restoration at the BOP facility in Butner. Later that year, the court received two reports from Mitchell's psychologist at BOP-Butner—one in July and the other in

_____

[2]As relevant here, decompensation is "a breakdown in an individual's defense mechanisms, resulting in progressive loss of normal functioning or worsening of psychiatric symptoms." *Decompensation*, APA Dictionary of Psychology, Am. Psych. Ass'n, https://dictionary.apa.org/decompensation (last visited Aug. 20, 2021).

October—both of which concluded that Mitchell remained incompetent. The latter also opined that Mitchell's level of voluntary compliance with antipsychotic medication was around 50% and that his competency was unlikely to be restored at that rate. In March 2019, the government requested a hearing to determine whether involuntary medication of Mitchell was warranted under Sell.

At the Sell hearing, which did not take place until June 25, 2019, a BOP psychiatrist testified that Mitchell had become 90% compliant with his medications and that this was sufficient to restore his competency. In light of this information, the magistrate judge recommended denying the government's motion to involuntarily medicate Mitchell, finding that it had failed to prove the necessity for doing so. The district court accepted this recommendation in October 2019.

In early December 2019, the magistrate judge received an updated report from a psychologist at BOP-Butner opining that Mitchell was competent and that his continued competence was contingent upon his willingness to take his medications. In the two months leading up to that report, Mitchell's level of voluntary compliance had fallen back down to between 60% and 65%. The magistrate judge thus scheduled a competency hearing for January 2, 2020, and Mitchell was transported from BOP-Butner to the Linn County Jail in Iowa in a single day, on December 18, 2019. At the hearing, the magistrate judge found Mitchell competent based on a November 2019 report from the BOP psychologist. That report did not reflect, however, that Mitchell's voluntary compliance had declined further while at the Linn County Jail: in December 2019 and January 2020, Mitchell took his medications only 20% of the time. As a result, three weeks after finding Mitchell competent, the magistrate judge granted defense counsel's request for another competency evaluation.

Mitchell arrived at the SeaTac Federal Detention Center in Seattle, Washington, on February 6, 2020, for a 30-day evaluation period that was later extended. Though Mitchell's voluntary compliance with medication while at BOP-SeaTac was around 62% and he "presented more stable," Mitchell refused to

participate in the evaluation process, so the BOP psychologist could not determine his competency. The psychologist noted that Mitchell still seemed to be experiencing psychotic symptoms, had poor hygiene, "exhibited fluctuating medication compliance," and engaged in hoarding and other "questionable behaviors." On April 17, 2020, based on "the latest report" from BOP-SeaTac "as well as past forensic evaluations," the magistrate judge found Mitchell incompetent to stand trial.

Mitchell returned to BOP-Butner on July 28, 2020, for a third round of competency restoration. His voluntary compliance with medication was 90% in August 2020 and 50% in the first half of September, with an overall compliance rate of 76.6% by September 18, 2020. On October 19, 2020, after holding a competency hearing, the magistrate judge found Mitchell competent to proceed.

That same month, though, the government also filed a second motion for involuntary medication pursuant to Sell. At the Sell hearing on November 20, 2020, the chief psychiatrist at BOP-Butner, Dr. Logan Graddy, testified that Mitchell would decompensate if he stopped taking his medications, but that he could not identify the precise rate of voluntary compliance necessary to maintain Mitchell's competency. Dr. Graddy also testified that, though Mitchell had been found competent while 60% compliant in the past, at other times he had decompensated rapidly after missing only a few doses. Dr. Graddy submitted a treatment plan setting out the maximum and minimum dosages of antipsychotic medication to be involuntarily administered in the event of Mitchell's noncompliance.

In a detailed report issued on December 22, 2020, the magistrate judge recommended granting the government's motion for involuntary medication under Sell. The magistrate judge explained that unlike the evidence presented at the first Sell hearing in June 2019, the evidence—namely, Dr. Graddy's testimony—"now establishes . . . that Mitchell's previous episodes of decompensation were caused by medication noncompliance." The magistrate judge previously denied the government's first motion for involuntary medication in part because "Mitchell's

-4-

noncompliance and decompensation" at the time "could have been triggered by the lengthy transport process—it took eleven days and stays at three different facilities to move him from BOP-Springfield back to the local jail." This time, however, the evidence showed that Mitchell had decompensated in December 2019—after the second round of competency restoration—despite having been transported from BOP-Butner to the Linn County Jail in a single day. Considering Dr. Graddy's testimony that "noncompliance caused [Mitchell's] symptoms," the magistrate judge ruled out transport as a trigger for Mitchell's decompensation. The magistrate judge also rejected Mitchell's argument that "as a categorical rule, a court cannot order involuntary medication under Sell when the defendant is competent," and ultimately concluded that Mitchell's "past history demonstrates that without an involuntary-medication order, it is only a matter of time before his voluntary compliance deteriorates and he is rendered incompetent for a fourth time."

On January 21, 2021, the district court accepted the magistrate judge's recommendation and ordered that "[i]f Mitchell does not voluntarily comply with his medication regimen, the Bureau of Prisons is authorized and directed to involuntarily administer antipsychotic medication as deemed appropriate by Mitchell's treating psychiatrist, consistent with Dr. Graddy's proposed treatment plan, until and while Mitchell stands trial." The district court further specified that Mitchell's "medication compliance rate shall not be allowed to fall below 76% per month."

II.

"[A]n individual has a significant constitutionally protected liberty interest in avoiding the unwanted administration of antipsychotic drugs." Sell, 539 U.S. at 178 (cleaned up) (quoting Washington v. Harper, 494 U.S. 210, 221 (1990)). In Sell, "[t]he Supreme Court articulated a four-element test for determining the circumstances in which the government may obtain a court order to involuntarily medicate a defendant to render him competent to stand trial." Coy, 991 F.3d at 928 (cleaned up). "Those elements are: (1) that an important governmental interest is at

stake; (2) that involuntary medication will significantly further that governmental interest; (3) that involuntary medication is necessary to further that interest; and (4) that administration of the drugs is medically appropriate." Id. at 928-29 (cleaned up). "We review *de novo* a court's legal determination that important governmental interests are at stake." United States v. Mackey, 717 F.3d 569, 573 (8th Cir. 2013). Because "[t]he government must prove the other three elements by clear and convincing evidence, . . . we review the district court's findings" on those elements "for clear error." Id.

A.

Mitchell argues that Sell does not permit a court to order the involuntary medication of a competent defendant. He emphasizes that the question before the Sell Court was whether "forced administration of antipsychotic drugs to *render* [a defendant] competent to stand trial unconstitutionally deprive[s] him of his liberty to reject medical treatment." 539 U.S. at 177 (emphasis added) (cleaned up). Because "render" means, in relevant part, "to cause to be or become: make," *Render*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003)—implying a change from one state of being to another—Mitchell asserts that Sell did not contemplate the use of involuntary medication to maintain or preserve a defendant's competency. He points to the Sell Court's discussion of competency *restoration* as further support for this argument. See, e.g., Sell, 539 U.S. at 185 (explaining that whether a drug has certain side effects, such as whether it "will tend to sedate a defendant," is "important in determining the permissibility of medication to restore competence"). In short, Mitchell maintains that "incompetence is a condition precedent to forcible administration of antipsychotics" and, at the time of the Sell hearing, he had been declared competent.

By focusing solely on the word "render," Mitchell overlooks an important aspect of the Sell standard: "whether involuntary administration of drugs is necessary significantly to further a particular governmental interest, namely, the interest in rendering the defendant competent to stand trial." Id. at 181 (emphasis

omitted).  Under <u>Sell</u>, the mere competency of a defendant, standing alone, is not the governmental interest at stake.  Competency *to stand trial* is.  And as Mitchell acknowledges, <u>Sell</u> authorizes the government not only to involuntarily medicate an incompetent defendant, but also to continue doing so during trial.  See <u>id.</u> at 185 (discussing how antipsychotic medication may affect a defendant during trial and how this might bear on the second <u>Sell</u> element).  Permitting involuntary medication through the conclusion of trial ensures, at the risk of stating the obvious, that the defendant will remain—at all necessary times—"competent to stand trial."  <u>Id.</u> at 177.  As the magistrate judge explained, it prevents the very type of situation at risk of happening here: a defendant who cycles in and out of competency indefinitely and who may never be able to stand trial if the cycle continues.  Given that the purpose of involuntary medication under <u>Sell</u> is to ensure the defendant is competent enough to participate in trial, adopting a rule that categorically prohibits the involuntary medication of a defendant who has regained competency for some period of time, but who is unable to maintain it, would frustrate that purpose where an important governmental interest is at stake.

We recognize that the issue Mitchell raises is one of first impression for this court, and both sides say the other is unable to cite to any published cases in support of its position.  But even if Mitchell's case presents an uncommon fact pattern, the <u>Sell</u> standard provides the applicable framework for determining whether "involuntary administration of drugs solely for trial competence" is appropriate.  <u>Id.</u> at 180.  This is not to say that a defendant's restoration to competency before trial is not relevant to the <u>Sell</u> analysis.  Whether the government has met its burden in proving the necessity of forced medication is a challenging and important decision for the district court, with weighty considerations in the mix.  See <u>United States v. Chatmon</u>, 718 F.3d 369, 373 (4th Cir. 2013) ("The question of when the government may involuntarily administer psychotropic drugs to a defendant for the purpose of rendering him competent to stand trial entails a difficult balance between the defendant's interest in refusing mind-altering medication and society's interest in bringing the accused to trial.").  Indeed, the nature of mental illness is such that an individual defendant's condition may change significantly over time, and, depending

on the circumstances, a defendant's restoration to competency may factor differently into the question of whether involuntary medication is necessary to further the government's interests. But Mitchell's proposed bright-line rule, which treats competency as static, does not comport with the careful, fact-specific balancing of a defendant's and the government's competing interests that <u>Sell</u> requires.

Accordingly, the district court did not err in concluding that it had the authority to order the involuntary medication of Mitchell for the purpose of rendering and maintaining his competency for trial.

B.

Next, we consider Mitchell's argument that the district court clearly erred in finding that involuntary medication is necessary to further the government's interests in timely prosecution under the third <u>Sell</u> element. <u>See</u> <u>Mackey</u>, 717 F.3d at 573. Involuntary medication is "necessary" when "alternative, less intrusive means are unlikely to achieve substantially the same results." <u>Sell</u>, 539 U.S. at 181. The district court reasonably credited Dr. Graddy's testimony that, while therapy or supportive housing may be beneficial for schizophrenia, antipsychotic medication is the "mainstay" and the "best" treatment for the condition. Considering Dr. Graddy's testimony "that Mitchell has 'acted out' after missing just one dose" and "that Mitchell will decompensate if he does not adhere to his medication regimen," the district court plausibly concluded that Mitchell "clearly risks decompensating upon missing a relatively small number of doses." Mitchell's sporadic compliance also supports the district court's finding that "Mitchell has demonstrated a pattern of failing to voluntarily maintain a medication regimen upon becoming competent." And given Mitchell's indigency and the fact that he "will remain in custody regardless," it was reasonable for the district court to reject the less-intrusive threat of a contempt order as a viable alternative to forcible medication.

The district court's order is narrowly and carefully tailored to minimize the intrusion on Mitchell's protected liberty interests. The order does not mandate the

forcible administration of every prescribed dose of antipsychotic medication. Rather, it provides that Mitchell's "medication compliance shall not be allowed to fall below 76% per month," meaning Mitchell can avoid involuntary medication so long as he complies with his medication regimen at the rate specified. On this record, the district court's finding that involuntary medication is necessary to achieve the government's interests was not clearly erroneous. Because Mitchell does not challenge the district court's conclusions as to the first, second, and fourth Sell elements, we need not address them.

## III.

The district court's order is affirmed.

_____